# COURT OF APPEALS OF VIRGINIA

### Record No. 2145-25-1

COMMONWEALTH OF VIRGINIA
v.
PHILLIP GRAHAM

Present: Judges O'Brien, Chaney and Raphael
Argued by videoconference

Opinion Issued April 28, 2026[*]

### FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Devon R. Paige, Judge

John A. Fisher, Assistant Attorney General (Jay Jones, Attorney General, on briefs), for appellant.

Taite A. Westendorf (Westendorf & Khalaf, PLLC, on brief), for appellee.

### MEMORANDUM OPINION BY
### JUDGE MARY GRACE O'BRIEN

The Commonwealth appeals the trial court's decision to suppress (1) Phillip Graham's statement about marijuana, and (2) evidence obtained from a search of Graham's backpack. We affirm the court's suppression of Graham's statement. But the court erred in finding that the police could not conduct a protective sweep of Graham's backpack. Thus, we affirm in part, reverse in part, and remand for further proceedings.

### BACKGROUND

When reviewing a decision granting a motion to suppress, we view the evidence in the light most favorable to the defendant, the prevailing party below, and grant him all reasonable inferences fairly deducible from that evidence. *Commonwealth v. Grimstead*, 12 Va. App. 1066, 1067 (1991).

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

In December 2024, Norfolk Police Officers David Jacob and Benjamin Heffington were patrolling in Norfolk when they observed a vehicle with "a heavily tinted license plate cover," which prevented them from "correctly read[ing] the tag." They initiated a traffic stop, and the car stopped promptly.

Officer Jacob approached the driver's side while Officer Heffington approached the passenger side. The car's windows were also heavily tinted. The driver's side window was rolled down, but when Officer Jacob told the driver, later identified as Graham, to lower the back windows, Graham protested. Officer Jacob explained that he does not walk past windows he "can't see through." When Graham still did not comply, Officer Jacob ordered him out of the vehicle. Graham initially refused but exited the vehicle after Officer Jacob opened the driver's door. When Graham began to complain to Officer Heffington about Officer Jacob's behavior, Officer Jacob handcuffed Graham's hands behind his back and walked him to the police vehicle.

Officer Jacob testified at the suppression hearing that he placed Graham in handcuffs due to "a number of factors . . . related to officer safety," including Graham's "lack of compliance," the "setting," which Officer Jacob noted was near "three of the most dangerous neighborhoods" in Norfolk, and the officers' lack of information about Graham caused by their inability to run his license plate or gather other identifying information. Officer Jacob acknowledged that handcuffing Graham was "certainly out of the ordinary" and "not something [he] d[id] lightly" but would do so "when people [were] extremely agitated."

Officer Jacob tried to get Graham to face the police car while Graham complained about the stop, telling the officers he had "anxiety." When Officer Heffington said, "You obviously have an anger problem too," Graham responded, "Duh! I have bipolar" disorder, "Type I." Officer Jacob then asked Graham if he had "any weapons." Graham responded that he did not have any weapons on his person but had one in his car. Officer Jacob asked for clarification, and

Graham responded that he had a gun in his backpack. Officer Jacob frisked Graham for weapons, discovering none. He then placed Graham in the back of the police car and closed the door. While in the back of the locked police car, Graham told the officers that his gun was in his backpack in the trunk but that he did not want to open the trunk. After being told for the first time why he was stopped, Graham asked if he could be released from the car "so he could go home," to which Officer Jacob responded, "Absolutely not."

Graham gave Officer Heffington permission to retrieve Graham's driver's license from his car's center console. The police confirmed that the license was "valid" and that Graham did not have any active warrants or felony convictions. Graham again asked to be released, and Officer Jacob responded, "You are still detained. We are just getting started with this traffic stop . . . . You are staying right there until I'm done." Graham then asked, "I'm not going to jail?" and Officer Jacob responded, "At this point, maybe." Graham asked what he had to do to be released. Instead of answering, Officer Heffington said, "Let's just rewind back to the point where you were refusing lawful orders."

While Graham and Officer Jacob continued to talk, Officer Heffington walked back to Graham's car and shined a flashlight through the windows. He saw a backpack on the backseat about "one to two feet" from the driver's seat. A portion of the backseat was folded down, providing access to the trunk, with the backpack partially in the trunk and partially in the seat, "well within arm's reach" of a potential driver.

Officer Heffington returned to the police car and addressed Graham, who was still locked inside the car and handcuffed:

> Being that the . . . backpack and the firearm are accessible from the passenger compartment because that back middle seat is down, there's access to the trunk. I observe that. Okay. Um, when I go to get, retrieve the firearm out of the backpack and ensure that it's not stolen, is there anything about . . . the firearm? We do that, on every stop where there's a . . . firearm, we run the serial number.

Is there anything else in that backpack that I'm gonna be worried about when I find that firearm?

Graham replied, "my weed" and responded to Officer Jacob's follow-up question about the amount by stating that there was about a "p" of "weed," which the officers interpreted to mean a pound of marijuana. The officers had not read Graham his *Miranda*[1] rights.

Officer Heffington returned to Graham's car and retrieved the backpack. One of the bag's front compartments was unzipped, and Officer Heffington observed a digital scale in that compartment. The bag's main compartment was partially unzipped. Officer Heffington unzipped it further and removed an opaque black plastic bag, feeling the bag's contents as he removed it. There was a firearm underneath. Officer Heffington placed the firearm on the top of Graham's car and then picked up the plastic bag again. He testified that he felt "the bud shape" of marijuana inside the bag, a shape and feel he recognized "based on [his] training and experience." He then removed a round plastic storage container from the backpack with a transparent lid. Inside the container were several Ziploc bags that appeared to contain green leafy material.

Officer Heffington placed the firearm and storage container on the hood of the police car. The officers then returned to the car, where Officer Heffington showed the plastic bag to Officer Jacob while manipulating its contents and stated, "I can't identify except for feel what's in this bag, . . . but that's two huge heads . . . . That's weed." Officer Jacob then looked inside and verified that it was marijuana.

A grand jury indicted Graham for possession with intent to distribute more than half an ounce but less than five pounds of marijuana and possession of a firearm while possessing with

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

intent to distribute marijuana. Graham moved to suppress his statement "that [the police] would find marijuana in his bag," as well as all evidence seized during the stop.

Officer Jacob testified at the suppression hearing that it would have "pose[d] an enormous safety risk" to allow Graham "back into a vehicle with access to a loaded firearm." Officer Jacob's "standard practice" when he learned about a firearm during a traffic stop was to retrieve the firearm, "make it clear and safe, potentially even breaking it down, field stripping it," and place it in the trunk. Doing so would allow the driver to retain possession of the firearm while reducing the possibility of officers "taking rounds while driving away" from the stop. Similarly, Officer Heffington testified that there was "no world" in which he would "let an individual who [was] exhibiting [Graham's] behavior enter a vehicle with a loaded firearm at the conclusion of the stop." Officer Heffington also would have unloaded the firearm and placed it in Graham's trunk.

Following the hearing, the court took the motion under advisement, in part to allow the parties to submit additional briefs. The Commonwealth subsequently submitted a letter briefly arguing that the discovery of the marijuana was inevitable even if the court suppressed Graham's statement about the marijuana.

The trial court granted Graham's suppression motion. The court found "a custodial interrogation arose when Graham was questioned about the contents of his backpack." "As such, Graham should have been *Mirandized*." Accordingly, the court suppressed Graham's statement indicating that he had a pound of marijuana in his backpack.

The court further found that the protective sweep doctrine did not justify the backpack search because "[a]t the time the sweep was made [Graham] was handcuffed in the back of the officer's patrol car." The court noted that "Graham was agitated and argumentative with the officers" but also "cooperated with their requests for information, made no verbal or physical

threats of violence, and was forthcoming." Ultimately, the court concluded that "[t]here was no credible evidence that Graham posed a danger to the officers." The court also found that Graham did not consent to the search. The Commonwealth appeals under Code § 19.2-398(A)(2).

## ANALYSIS[2]

### I. *Miranda*[3]

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Thus, the prosecution may not "us[e] statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Keepers v. Commonwealth*, 72 Va. App. 17, 34 (2020) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). At a minimum, the police must warn a suspect in their custody that he possesses certain

---

[2] We reject Graham's procedural arguments. First, Graham contends that the Commonwealth's first assignment of error is fatally defective because it fails to identify the basis of the trial court's error. The Commonwealth's assignment adequately identifies the challenged ruling, and it is not necessary to "state within [the] assignment of error precisely *why* it was error for the trial court to [grant] the motion to suppress." *Findlay v. Commonwealth*, 287 Va. 111, 116 (2014) (rejecting the argument that each assignment of error must include a "'because' clause or its equivalent"). Next, Graham argues that the Commonwealth's second, third, and fourth assignments improperly allege "legal error" but are more properly understood as alleging factual error. But whether to grant a motion to suppress is a mixed question of law and fact reviewed de novo on appeal, *Jones v. Commonwealth*, 277 Va. 171, 177 (2009), and the Commonwealth challenges the trial court's application of the facts to the law. Finally, we need not address Graham's argument that the Commonwealth failed to preserve its inevitable discovery argument because we do not resolve the case on inevitable discovery grounds.

[3] The trial court suppressed only Graham's statement about the marijuana and not his earlier statements about the firearm. In its order, the court recited Graham's argument: "Graham alleges that *his statement regarding marijuana . . . was obtained in violation of Miranda*, and therefore should be suppressed." (Emphasis added). The court later concluded, "In summation, *the statement* and the evidence recovered from the backpack is suppressed." (Emphasis added). Nothing in the court's order indicates that it suppressed Graham's earlier statements about the firearm.

rights, such as the right to remain silent or to have an attorney present during questioning. *Miranda*, 384 U.S. at 479.

These *Miranda* warnings are required only when a suspect is subject to custodial interrogation. *Keepers*, 72 Va. App. at 34. Whether a suspect is subjected to custodial interrogation "is a mixed question of law and fact." *Spinner v. Commonwealth*, 297 Va. 384, 392 (2019). Appellate courts "review such questions de novo but defer to the fact-finder's findings of historical fact unless they are plainly wrong or without evidence to support them." *Id.*

"Custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Keepers*, 72 Va. App. at 34 (quoting *Miranda*, 384 U.S. at 444). "The ultimate inquiry . . . is . . . whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Id.* (quoting *Spinner*, 297 Va. at 392). We evaluate "how a reasonable person in the suspect's situation would have understood his circumstances." *Alvarez Saucedo v. Commonwealth*, 71 Va. App. 31, 41 (2019) (quoting *Dixon v. Commonwealth*, 270 Va. 34, 40 (2005)). "[P]ersons temporarily detained pursuant to [traffic] stops generally are not 'in custody' for purposes of the *Miranda* rule." *Dixon*, 270 Va. at 40. But the presence of certain factors may convert an investigatory detention during a traffic stop into custody. *Id.* Relevant factors "include whether the police used physical restraints, displayed their weapons, engaged in physical contact, or told the suspect he was free to leave." *Keepers*, 72 Va. App. at 34.

The facts in this case closely mirror those in *Dixon*, in which our Supreme Court concluded that *Miranda* warnings were required. 270 Va. at 40-41. In that case, the police handcuffed Dixon's hands behind his back, secured him in the front passenger seat of the patrol

car, and locked the car. *Id.* at 38, 40. Even though the police told Dixon that he was not under arrest and was being detained for investigative reasons, the Supreme Court held that a reasonable person in Dixon's circumstances "would have understood that his freedom was being restricted to a degree associated with a formal arrest," requiring the police to provide *Miranda* warnings. *Id.* at 40. That conclusion was "influenced most strongly by the combined factors of Dixon being restrained in handcuffs and being locked in a police patrol car." *Id.* at 40-41.

Like Dixon, Graham was handcuffed and locked in a police car. Additionally, Officers Jacob and Heffington both told Graham that he was not free to leave, and when Graham asked if he was going to jail, Officer Jacob responded, "At this point, maybe." As Officer Jacob explained at the suppression hearing, the level of control exercised over Graham was "certainly out of the ordinary" for a traffic stop. Just as in *Dixon*, we conclude that Graham, although not officially under arrest, was restrained to "a degree associated with a formal arrest" and was therefore in custody for *Miranda* purposes when Officer Heffington asked him about the contents of the backpack. *See Dixon*, 270 Va. at 40.

Officer Heffington's question about the backpack, asked while Graham was in custody and before the police notified him of his *Miranda* rights, was interrogatory. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Commonwealth v. Quarles*, 283 Va. 214, 221 (2012) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

Noting that the officers would "run the serial number" on the firearm, Officer Heffington asked Graham if there was anything he wanted to say about the firearm. Officer Heffington also asked Graham if there was "anything else in that backpack that" Officer Heffington should "be

- 8 -

worried about." Officer Heffington conceded at the suppression hearing that his question about the backpack and firearm was to give Graham "the opportunity to let [Officer Heffington] know if [Graham] purchased the firearm in an unorthodox manner or if [he] knew the firearm to be illegally obtained, as well as anything that [Officer Heffington] may find within the same view of that firearm as [he] retrieve[d] it." Even setting Officer Heffington's subjective intent aside, a reasonable officer in his position would have known that his open-ended question about whether there was "*anything*" he, as a police officer, should "be worried about" was "reasonably likely to elicit an incriminating response." *Quarles*, 283 Va. at 221 (quoting *Innis*, 446 U.S. at 301). Accordingly, *Miranda* warnings were required, and the trial court properly suppressed Graham's statement about the marijuana.

## II. The Backpack Search

The Fourth Amendment of the United States Constitution protects people from "unreasonable searches and seizures." U.S. Const. amend. IV. "[W]arrantless searches are *per se* unreasonable, subject to a few specifically established and well-delineated exceptions." *McCarthy v. Commonwealth*, 73 Va. App. 630, 639 (2021) (alteration in original) (quoting *Megel v. Commonwealth*, 262 Va. 531, 534 (2001)).

The Commonwealth argues that two exceptions apply: first, that Graham voluntarily consented to Heffington's search of the backpack; and second, that the protective sweep doctrine justified the search. We agree with the Commonwealth's latter argument and therefore need not address the former argument. *See Commonwealth v. White*, 293 Va. 411, 419 (2017) ("[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015))); *see also Theologis v. Weiler*, 76 Va. App. 596, 603 (2023) (explaining that this Court looks to resolve cases on the "*fewest* grounds").

Under the seminal case of *Terry v. Ohio*, 392 U.S. 1, 26 (1968), a police officer who has reasonable suspicion that a suspect is armed and dangerous may conduct "a limited search for weapons." In *Michigan v. Long*, 463 U.S. 1032, 1049 (1983), the Supreme Court of the United States held that *Terry* justified a protective sweep for weapons even in areas that may be beyond the reach of a temporarily detained suspect. Thus, "under certain circumstances," the police are permitted "to conduct a pat down of a person and a protective sweep of his or her vehicle for weapons" during a traffic stop. *Gross v. Commonwealth*, 79 Va. App. 530, 536 (2024) (quoting *Bagley v. Commonwealth*, 73 Va. App. 1, 13 (2021)). Such a search is "limited to those areas in which a weapon may be placed or hidden" and requires that the police possess "a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and . . . may gain immediate control of weapons." *Long*, 463 U.S. at 1049 (quoting *Terry*, 392 U.S. at 21).

The Supreme Court of the United States has "recognized that investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Id.* at 1047. "[S]uspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed." *Id.* at 1048. Due to these concerns about officer safety, "police may conduct a protective sweep of the vehicle based on the assumption that when the stop concludes, the individual presumably 'will be permitted to reenter his automobile' and 'will then have access to any weapons inside.'" *Gross*, 79 Va. App. at 537 (quoting *Bagley*, 73 Va. App. at 15). Thus, "a protective search is authorized even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested." *Id.* (quoting *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007)).

The trial court failed to give due consideration to that caselaw when it concluded that the protective sweep doctrine did not justify the search because Graham "was handcuffed in the back of the officer's patrol car." *See Long*, 463 U.S. at 1051 (rejecting the Michigan Supreme Court's reasoning "that it was not reasonable for the officers to fear that Long could injure them, because he was effectively under their control during the investigative stop and could not get access to any weapons that might have been located in the automobile" as "mistaken in several respects"). By relying primarily on Graham's inability to access the weapon at the time of the search, the trial court committed legal error. The proper question under *Long* and its progeny is whether the officers had reasonable suspicion that Graham might be armed and dangerous *if allowed to get back into his vehicle*. We answer that question in the affirmative.

"The degree of certitude required for "'reasonable suspicion" is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less demanding than that for probable cause.""" *Hill v. Commonwealth*, 297 Va. 804, 815 (2019) (emphases omitted) (quoting *Perry v. Commonwealth*, 280 Va. 572, 581 (2010)). In determining whether the officers had reasonable suspicion, we consider the totality of the circumstances, "the time of the stop, the specific conduct of the suspect[ed] individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." *Bazemore v. Commonwealth*, 82 Va. App. 478, 493 (2024) (quoting *McCain v. Commonwealth*, 275 Va. 546, 554 (2008)).

The validity of a *Terry* search does not depend "on whether the weapon is possessed in accordance with state law." *Long*, 463 U.S. at 1052 n.16. Some of our cases have suggested that, when it comes to a *Terry* stop, "armed" may equal "dangerous." *See, e.g.*, *Bagley*, 73 Va. App. at 16 ("The standard requires proof of only a reasonable belief that the suspect *might* have a weapon and gain control of it."); *Jones v. Commonwealth*, 52 Va. App. 548, 560-61

(2008) (stating that reasonable suspicion that suspect possessed a concealed weapon "*ipso facto* rendered him potentially armed and dangerous," justifying a *Terry* search). We need not go that far here, however, because there was ample reason for the officers to suspect that Graham was both armed and dangerous.

First, the officers reasonably believed that Graham had a weapon and could have gained access to it if they released him back to his vehicle because Graham admitted that he had a gun and told the officers they could find it in a backpack that was in reach of the driver's seat. Second, even if the presence of a firearm is insufficient in itself to provide reasonable suspicion of dangerousness, the officers articulated other reasons for suspecting Graham of being dangerous. For example, Officer Jacob emphasized that the stop occurred at the intersection of three of the most dangerous neighborhoods in the city. Graham was also visibly agitated with the officers and responded "Duh!" when Officer Heffington accused him of having "an anger problem," which Graham tied to his bipolar disorder. Most importantly, he refused to comply with commands connected with officer safety, such as the command to roll down his tinted windows so that Officer Jacob could see Graham during the stop.

Courts in Virginia have cited similar circumstances in upholding protective sweeps in the past. *See Hill*, 297 Va. at 816-17 (upholding protective sweep where the suspect was in a high-crime area, refused to comply with police commands, and appeared to be reaching for something in his car); *Bazemore*, 82 Va. App. at 495 (upholding protective sweep due to the suspect's gang affiliation, prior firearm charges, and evasive answers to police questions); *Gross*, 79 Va. App. at 538-39 (upholding protective sweep because the suspect was in a high-crime area, initially refused to stop for the police, and appeared to be reaching for something when the police approached); *Bagley*, 73 Va. App. at 17-18 (upholding protective sweep where the police had a tip that someone matching the suspect's description had recently brandished a firearm and the

- 12 -

suspect appeared to reach for something when confronted by police). Considering Graham's admission that he had a firearm that would indisputably be within his reach should he be allowed to drive away, the officers in this case had even greater reason than the officers in *Hill*, *Bazemore*, *Gross*, or *Bagley* to believe that the suspect was armed and dangerous. As in those cases, it would be "clearly unreasonable to deny the officer[s] the power to take necessary measures to determine whether" Graham possessed a weapon "and to neutralize the threat of physical harm." *Long*, 463 U.S. at 1047 (quoting *Terry*, 392 U.S. at 24). Thus, Officer Heffington was justified in conducting a protective sweep of Graham's backpack.

We also reject Graham's argument that, even if the police were justified in conducting a protective sweep, "the continued search of a separate black bag within the backpack" exceeded the scope of that justification. "If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should . . . discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances." *Long*, 463 U.S. at 1050. Under the "plain feel" doctrine, "when the character of the object felt by the officer is immediately apparent either as a weapon or some form of contraband, the object is for all practical purposes within the plain view of the officer." *Cost v. Commonwealth*, 275 Va. 246, 252 (2008).

Here, Officer Heffington observed a digital scale in an unzipped portion of the backpack, which Heffington knew was a common tool of drug distribution. He testified that he could feel the "bud shape" of marijuana through the plastic bag that he lifted off of the firearm and knew that it contained marijuana "based on [his] training and experience." Footage from the body camera also showed him feeling the bag and identifying it as marijuana to Officer Jacob based on feel alone. Underneath the firearm was a plastic storage container with a transparent lid that appeared to contain more marijuana. The record indicates that, even excluding Graham's

admission that he had marijuana in his backpack,[4] the contraband character of the marijuana was immediately apparent to the officers, allowing them to seize it.

CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment suppressing Graham's statement about the marijuana and reverse the trial court's judgment suppressing evidence obtained from the search of Graham's backpack. We remand for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded.*

---

[4] Even if the physical evidence were the fruits of the suppressed statement, a violation of the prophylactic *Miranda* rule does not by itself warrant the suppression "of the physical fruit[s] of a voluntary statement." *United States v. Patane*, 542 U.S. 630, 636 (2004). And because we hold that the officers lawfully obtained the marijuana during a protective sweep, we need not address whether they would have inevitably discovered the marijuana through some other means. *See Knight v. Commonwealth*, 71 Va. App. 771, 787 (2020) (explaining that the inevitable discovery doctrine is an exception to the exclusionary rule that applies when evidence is "obtained by *unlawful* means" but "ultimately or inevitably would have been discovered by lawful means" (emphasis added) (quoting *Carlson v. Commonwealth*, 69 Va. App. 749, 763 (2019))).

Chaney, J., concurring in part and dissenting in part.

I agree with the majority that the circuit court correctly suppressed Phillip Graham's un-*Mirandized* statement about marijuana. I depart, however, from the majority's conclusion that the circuit court erred in suppressing the evidence recovered from the search of his backpack. The circuit court correctly found that the protective-sweep doctrine did not justify the search of the backpack and that, independently, the scope of the search exceeded any safety justification, even if the initial retrieval of the firearm had been lawful. Finding no error in the circuit court's ruling suppressing the evidence recovered from the backpack search, I would affirm the circuit court's order granting suppression and respectfully dissent.[5]

## I. The Circuit Court Did Not Err in Suppressing the Evidence Recovered from the Backpack Search

### A. *The Circuit Court's Factual Findings Are Entitled to Deference*

On the Commonwealth's appeal from an order granting a motion to suppress, we view the evidence in the light most favorable to the defendant, the prevailing party below, and grant all reasonable inferences fairly deducible from that evidence. *Commonwealth v. Grimstead*, 12 Va. App. 1066, 1067 (1991). The circuit court's findings of fact are "entitled to a presumption of correctness unless they are plainly wrong or without evidence to support them."

---

[5] The majority declines to address whether the Commonwealth's fifth assignment of error regarding inevitable discovery was properly preserved, concluding that resolution on protective sweep grounds makes that question unnecessary to reach. *Supra* at 6 n.2. Graham contends the issue is barred by Rule 5A:18. The Commonwealth's entire submission on inevitable discovery before the circuit court was a single paragraph in a supplemental letter filed after the suppression hearing closed, citing no authority for the doctrine and analyzing neither prong of the inevitable discovery test. R. Add. 1-2; *see Carlson v. Commonwealth*, 69 Va. App. 749, 763 (2019) (requiring proof of both a reasonable probability of discovery by lawful means and that the leads making discovery inevitable were possessed at the time of the alleged misconduct (quoting *Commonwealth v. Jones*, 267 Va. 532, 536 (2004))). Even if reached, the argument fails as the only lawful investigative path the Commonwealth identifies is the very protective sweep the circuit court held unlawful, which cannot supply the independent source the inevitable discovery doctrine requires. *Id.* at 765 (quoting *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984)).

*Commonwealth v. Peterson*, 15 Va. App. 486, 487 (1992). The legal conclusions drawn from those facts are reviewed de novo. *Malbrough v. Commonwealth*, 275 Va. 163, 168-69 (2008).

In its written suppression order, the circuit court found that "a custodial interrogation arose when Graham was questioned about the contents of his backpack," that the officers' questions "were designed to elicit an admission of possession [of] contraband," and that "[a]s such, Graham should have been *Mirandized*." R. 83. As to the protective sweep, the court made comprehensive findings addressing Graham's conduct, the officers' credibility, the accessibility of the weapon, and the absence of any articulable basis for believing Graham posed a danger. The court found that although "Graham was agitated and argumentative with the officers," "he cooperated with their requests for information, made no verbal or physical threats of violence, and was forthcoming to the officers" and that "[t]here was no credible evidence that Graham posed a danger to the officers, and the weapon was not easily accessible." R. 83-84.

The court further found that "Graham did not consent" and ordered suppression of "the statement and the evidence recovered from the backpack." R. 84. The circuit court's findings are not limited to Graham's physical custody; they address his conduct and credibility and factual circumstances throughout the entire encounter, and they are entitled to a presumption of correctness on appeal. *Peterson*, 15 Va. App. at 487.[6]

---

[6] The majority declines to address the circuit court's ruling on consent, having resolved the appeal on protective sweep grounds. *Supra* at 9. The circuit court found that Graham did not consent to the search. R. 84. That finding is supported by the record. Consent to a search is valid only if voluntary under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *Byrd v. Commonwealth*, 50 Va. App. 542, 554 (2007). At the time of the alleged consent, Graham was handcuffed and locked in the back of a patrol car, the same custodial circumstances the circuit court found constituted interrogation requiring *Miranda* warnings. R. 83. Moreover, before he was placed in the police car, Graham expressly objected to any search of his vehicle: "[the weapon] is in my backpack in the trunk though, so I don't, I don't want to open my trunk." CW's Ex. 1 at 02:58-03:40. The coercive nature of Graham's custodial confinement and his prior objection to a search, taken together, support the circuit court's finding that he did not freely and voluntarily consent. The circuit court's consent ruling should be affirmed.

B.  *The Officers' Testimony Defeats Long's Individualized-Suspicion Requirement*

*Michigan v. Long*, 463 U.S. 1032 (1983), authorizes a protective sweep during a traffic stop when officers possess "a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and . . . may gain immediate control of weapons." *Id.* at 1049 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).  *Long* thus requires an individualized assessment grounded in the facts of the particular encounter.

The most probative evidence in the *Long* inquiry, the officers' own testimony about their standard practice, is central to this record.  Officer Jacob testified at the suppression hearing that "[e]very single situation or traffic stop where I've encountered a firearm in a vehicle, it has been removed[.]"  R. 102.  Officer Heffington confirmed that he does this "anytime" he discovers a firearm during a traffic stop, answering "[a]bsolutely" when asked whether that practice was categorical.  R. 110.  That categorical practice is the antithesis of *Long*'s individualized-suspicion requirement.  Where the officers testified that they would have retrieved the firearm in every case regardless of the driver's conduct, no explanation tied to the particulars of this encounter can supply the individualized suspicion *Long* requires.  An across-the-board policy of firearm removal is not a "specific and articulable" basis for a protective sweep under *Long*.

C.  *The Record Does Not Support a Finding of Individualized Dangerousness*

The majority concludes that the circuit court committed legal error by focusing on Graham's inability to access the weapon at the time of the search.  *Supra* at 11.  That characterization, however, does not accurately reflect the circuit court's written order.  The court found not only that "[a]t the time the sweep was made the defendant was handcuffed in the back of the officer's patrol car," R. 83, but also that he made no threats, cooperated with the officers, and was forthcoming to them, and that "[t]here was no credible evidence that Graham posed a

- 17 -

danger to the officers." R. 84. Those findings of fact and credibility are entitled to deference. The majority also frames the backpack as sitting "in reach of the driver's seat," but Officer Heffington confirmed on cross-examination that the backpack was straddling the backseat and the trunk compartment: "partially in the trunk, partially in the backseat." *Supra* at 12; R. 198. The circuit court's written finding that "the weapon was not easily accessible," R. 84, is squarely supported by that testimony and is entitled to a presumption of correctness. *Peterson*, 15 Va. App. at 487.

*Long* is not to the contrary. *Long* held that a suspect's being under temporary control does not automatically foreclose a protective sweep, because "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." 463 U.S. at 1052. Here, Graham was handcuffed, secured in a locked patrol car, and not in a position to regain access to the vehicle when the search occurred. The circuit court's reference to Graham's physical custody was therefore one factor in a broader assessment of his conduct, the accessibility of the weapon, and the absence of articulable dangerousness, not the legal error the majority identifies.

The Commonwealth's theory depends heavily on the possibility that Graham might later have been permitted to return to the vehicle. Op. Br. 26-27. But *Long* requires specific and articulable facts supporting a reasonable belief that this particular suspect would be dangerous if he regained access to the car. The circuit court found no such facts here. It expressly found that "[t]here was no credible evidence that Graham posed a danger to the officers." R. 84. The majority frames the "proper question" as whether the officers had reasonable suspicion that Graham "might be armed and dangerous if allowed to get back into his vehicle," but the circuit court already resolved the predicate factual questions bearing on that inquiry. *Supra* at 11-12. The circuit court watched the body-worn camera footage, heard the officers' testimony, and

made specific credibility determinations. Those factual findings are presumed correct and may not be disturbed unless plainly wrong or without evidence to support them. The record supports the circuit court's conclusion.

Graham voluntarily disclosed the firearm before he was placed in the patrol car, simultaneously stating, "I don't want to open my trunk." CW's Ex. 1 at 02:58-03:40. A voluntary and accurate disclosure of a lawfully possessed firearm does not, standing alone, establish dangerousness under *Long*. The cases that the Commonwealth relies upon involved materially different circumstances: active evasion, a suspect reaching toward a weapon, prior firearm-related charges, or a tip the suspect had recently brandished a weapon. *See Hill v. Commonwealth*, 297 Va. 804, 816-17 (2019) (suspect in high-crime area, refused commands, appeared to be reaching for a weapon); *Bazemore v. Commonwealth*, 82 Va. App. 478, 495 (2024) (gang affiliation, prior firearm charges, conflicting answers); *Gross v. Commonwealth*, 79 Va. App. 530, 538-39 (2024) (initially refused to stop for police, appeared to be reaching "for something"); *Bagley v. Commonwealth*, 73 Va. App. 1, 17-18 (2021) (tip that suspect had recently brandished a firearm, and when approached by law enforcement "made repeated, quick gestures with his arms and hands toward the driver's seat floorboard area of the car").

In each of those cases, the conduct giving rise to reasonable suspicion was conduct suggesting an imminent threat: reaching, evading, or prior brandishing, which is not present here. The majority's assertion that the officers therefore had "even greater reason" for a sweep than in *Hill*, *Bazemore*, *Gross*, or *Bagley* is not supported by the record. *Supra* at 13. Graham's disclosure, which the circuit court credited in finding him "forthcoming to the officers," R. 84, weighs against a dangerousness finding. Moreover, the neighborhood setting is a contextual factor, but it alone cannot support dangerousness under *Long*. *Compare Beasley v. Commonwealth*, 60 Va. App. 381, 398 (2012) (a suspect's presence in a high-crime area,

- 19 -

standing alone, is not enough to support a reasonable, articulable suspicion), *with* Op. Br. 31 ("At the outset, the trial court should have considered the fact that this traffic stop unfolded 'outside[] of Huntersville, one of the most dangerous, violent areas in the entire city.'").

Officer Jacob's own written report characterized Graham's behavior as "passive resistance." R. 100, 278. The record also reflects that, although Graham was upset and vocal, he did not threaten the officers, make threatening gestures, attempt to flee, or reach for a weapon. R. 82, 84. The majority cites Graham's initial failure to roll down the remaining windows as a significant safety factor. *Supra* at 12; R. 155, 158; CW's Ex. 1 at 01:02-01:30. The body-camera footage confirms that Graham's driver's window was already open when the officers first approached him. CW's Ex. 1 at 01:02-01:10; R. 166.

Graham's initial noncompliance is in the record. However, the circuit court reviewed the same video footage and nonetheless found that Graham "cooperated with their requests for information, made no verbal or physical threats of violence, and was forthcoming to the officers." R. 84. By the time his backpack was searched, Graham had been removed from the vehicle, handcuffed, and placed in the police vehicle's backseat. Declining to roll down his other windows immediately, considered together with all the other circumstances the circuit court found, does not supply the specific and articulable basis for believing an individual is armed and dangerous that *Long* requires. *See Long*, 463 U.S. at 1049; *see also McArthur v. Commonwealth*, 72 Va. App. 352, 362-63 (2020) (reversing protective sweep where driver stopped for defective fog light was cooperative, made no furtive movements, immediately complied with officer's requests, and declined consent to search his girlfriend's vehicle, holding that the exercise of a Fourth Amendment right to decline a warrantless search cannot supply reasonable articulable suspicion of dangerousness).

The majority incorrectly suggests Graham admitted to having "an anger problem." *Supra* at 12. The majority's use of "Duh!" with the removal of the next words "I'm bipolar" makes an incorrect suggestion that he was admitting to having an anger problem. If "Duh!" is seen as an admission, it was qualified with his explanation of anxiety and his bipolar disorder. CW's Ex. 1 at 02:35-02:41; R. 174-75. Officer Heffington responded that Graham "obviously" also had "an anger problem." CW's Ex. 1 at 02:42-02:49. Graham then identified his diagnosed bipolar condition. CW's Ex. 1 at 02:49-02:55; R. 159-60, 174-75. The "anger problem" characterization was the officer's label, not Graham's admission. Instead, Graham responded by identifying a medical diagnosis. The circuit court found that there "was no cause to believe he could not lawfully possess a firearm," R. 83, and that he "cooperated with their requests for information, made no verbal or physical threats of violence, and was forthcoming to the officers," R. 84. *Long*'s standard is grounded in specific observed conduct, and the circuit court's findings reflect its careful assessment of that conduct.

Most significantly, Officer Heffington conceded that Graham "was not an active threat" at the time of the weapon search. R. 109. *Long* does not require a suspect to present an immediate threat; it includes concern about the possibility of future access to weapons. *See Gross*, 79 Va. App. at 537. But *Long* still requires specific, articulable reasons to believe that this particular suspect would be dangerous upon release. Officer Heffington's concession that Graham posed no active threat, combined with both officers' admissions that their practice of firearm removal was categorical and the absence of any threatening act, strongly support the circuit court's finding that there was "no credible evidence that Graham posed a danger to the officers, and the weapon was not easily accessible." R. 84.

- 21 -

II. The Scope of the Search Independently Exceeded Any Legitimate Safety Justification

Even if *Long* authorized the initial retrieval of the firearm, the continued manipulation of the separate opaque black bags exceeded any legitimate safety justification and provides an independent basis[7] for affirming the suppression order.[8] The majority does not reach this argument, having resolved the appeal on protective sweep grounds. A protective sweep is "limited to those areas in which a weapon may be placed or hidden," *Long*, 463 U.S. at 1049, and "[t]he sole justification of the search in the present situation is the protection of the police officer and others nearby," *Gross*, 79 Va. App. at 536-37 (alteration in original) (quoting *Terry*, 392 U.S. at 29). The sequence of events confirms that any safety justification had been satisfied before the black bags were manipulated.

The body-camera footage and testimony establish the sequence of events. Officer Heffington retrieved the backpack by reaching through the fold-down armrest compartment connecting the backseat to the trunk, the same opening that, as Officer Heffington confirmed on cross-examination, left the backpack straddling the backseat and the trunk. CW's Ex. 4 at 11:15-12:00; R. 197-98. Officer Heffington then opened the backpack's main compartment, moved aside the opaque black bags lying on top, and retrieved the firearm from underneath

_____

[7] The distinction between the initial firearm retrieval and the continued manipulation of the bags matters because the Commonwealth defends the search on the ground that the protective sweep extended to "any area[]" where a weapon might reasonably be hidden. Op. Br. 15, 34-35. However, even under that theory, the later manipulation of separate opaque bags after the firearm had already been removed and secured required its own justification.

[8] The majority's ruling in this pretrial Commonwealth appeal is not binding on further appellate review. Code § 19.2-409 expressly provides that "[s]uch finality of the Court of Appeals' decision shall not preclude a defendant, if he is convicted, from requesting the Court of Appeals or Supreme Court on direct appeal to reconsider an issue which was the subject of the pretrial appeal." *See also* Code § 19.2-401 (defendant has no independent right of appeal in a pretrial Commonwealth appeal; Graham's participation here is as appellee only). Accordingly, Graham retains the right, if convicted, to seek appellate review of the majority's protective sweep and scope rulings on direct appeal, and those rulings are not preclusive.

them. R. 106. The body camera then shows Officer Heffington placing the recovered firearm on the hood of the police car. CW's Ex. 4 at 13:00-13:10. At that point, with the firearm removed, secured, and placed outside the vehicle, officer safety, the sole justification for the sweep, *see Terry*, 392 U.S. at 29; *Gross*, 79 Va. App. at 536-37, had been satisfied.

Officer Heffington then returned to Graham's car, picked the black bags back up from the backpack, and manipulated them. CW's Ex. 4 at 15:25-15:40. On direct examination, he described what he found: "The black bags that were removed that were overtop of the firearm in that main compartment of that backpack contained what I believe to be marijuana based on my training and experience. I was able to feel the bud shape of that marijuana substance within that bag[.]" R. 106. However, on the body-camera footage recorded at the scene, he told Officer Jacob: "I can't identify except for feel what's in this bag, . . . but that's two huge heads . . . . That's weed." CW's Ex. 4 at 15:25-15:35.

Under the plain feel doctrine, an object's incriminating character must be "immediately apparent" without the officer "squeezing, sliding and otherwise manipulating the contents." *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993); *see also Cost v. Commonwealth*, 275 Va. 246, 252 (2008) (the "plain feel" doctrine permits seizure only "when the character of the object felt by the officer is immediately apparent either as a weapon or some form of contraband"). Officer Heffington's testimony that he identified the contents only after feeling "the bud shape" of the substance within the bag shows the incriminating character was not immediately apparent. It was discovered only through manipulation of an opaque bag that, by then, posed no threat to officer safety.

Furthermore, by the time Officer Heffington turned back to the black bags, he had confirmed on direct examination that the purpose of the search had shifted. When asked whether the search at that point remained a protective sweep, he answered: "This is now a narcotics

investigation." R. 106. A *Long* sweep is limited to safety purposes. Once the search shifted to evidence gathering, the Fourth Amendment required consent, a warrant, or an applicable exception. *Long*, 463 U.S. at 1049-50; *Gross*, 79 Va. App. at 537. None of those was established here.

The majority's reliance on the digital scale observed in an unzipped compartment of the backpack does not alter this conclusion. *Supra* at 13; R. 195; CW's Ex. 4 at 11:33-11:39. The scale was in a separate, already-open compartment, not within the opaque black bags Officer Heffington manipulated after the firearm had been secured. It thus is irrelevant to the plain-feel analysis. To the extent the scale bears on probable cause, it does not supply the safety justification *Long* requires for continued manipulation of those separate opaque bags after the weapon had been removed.

CONCLUSION

The circuit court's factual findings on the protective sweep are supported by the record and are not plainly wrong. The search of Graham's backpack was not justified under *Long*, and, in any event, the continued manipulation of the opaque black bags exceeded any legitimate officer safety justification. I would affirm the court's order granting suppression in its entirety and, therefore, respectfully dissent in part from the majority's opinion.